**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
RENO, NEVADA**

| | |
|---|---|
| DEBORAH WARREN | 3:08-CV-667-ECR-VPC |
| Plaintiff, | |
| vs. | **Order** |
| SNAP-ON TOOLS COMPANY, LLC | |
| Defendant. | |

This diversity case arises out of the termination of Plaintiff Deborah Warren ("Warren") by her employer, Defendant Snap-On Tools Company, LLC ("Snap-On"). Warren contends that her termination constitutes a violation of the Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654. Both parties have filed motions for summary judgment (## 16, 21) on the issue of Snap-On's liability under the FMLA.

The motions are ripe, and we now rule on them.

### I. Factual and Procedural Background

Warren was employed by Snap-On at its distribution center in Carson City, Nevada. On October 13, 2008, Warren notified Snap-On that she needed time off work for an upcoming wrist surgery, and applied for leave under the FMLA. She was approved to take FMLA leave from November 7, 2008, to December 19, 2008, on the

1  understanding that the surgery was to take place on November 7,
2  2008.
3     On the evening of November 6, 2008, Warren's doctor informed
4  her that her surgery was postponed until the following Monday,
5  November 10, 2008.  During the day on November 7, 2008, Warren's
6  doctor again postponed the surgery, rescheduling it to November 11,
7  2008.  On November 11, 2008, Warren's surgery was finally
8  performed.
9     Warren did not attempt to go to work on November 7 or November
10 10, 2008.  Because of her requested FMLA leave, she was not
11 scheduled to work on either of those dates.  Nevertheless, it is
12 undisputed that she would have been scheduled to work, absent the
13 FMLA leave.  Warren also did not call Snap-On to report that her
14 surgery had been rescheduled by her doctor, making her unexpectedly
15 available to work on those dates.  On November 13, 2008, Snap-On
16 learned from its short-term disability carrier that Warren's
17 surgery took place on November 11, 2008, not November 7, 2008.  On
18 that same date, Snap-On terminated Warren for failing to work or to
19 call in on November 7 and November 10, 2008.
20    On December 22, 2008, Warren filed her Complaint (#1),
21 alleging that Snap-On had violated her rights under the FMLA by
22 terminating her.  Snap-On answered (#4), denying it violated
23 Warren's FMLA rights.  Snap-On's position is that Warren's
24 termination was consistent with the FMLA and Snap-On company
25 policies that are enforceable under the FMLA.
26    On October 13, 2009, Snap-On filed its motion for summary
27 judgment (#16) ("D.'s MSJ").  Warren opposed (#22) the motion
28
                                  2

(#16), and Snap-On replied (#24).  On October 28, 2008, Warren filed her motion for summary judgment (#21) ("P.'s MSJ").  Snap-On opposed (#23) the motion (#21), and Warren replied (#31).

## II. Summary Judgment Standard

Summary judgment allows courts to avoid unnecessary trials where no material factual dispute exists.  N.W. Motorcycle Ass'n v. U.S. Dep't of Agric., 18 F.3d 1468, 1471 (9th Cir. 1994).  The court must view the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir. 1996), and should award summary judgment where no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  Judgment as a matter of law is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party.  FED. R. CIV. P. 50(a).  Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted.  Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 116 S.Ct. 1261 (1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial.

3

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Although the parties may submit evidence in an inadmissible form — namely, depositions, admissions, interrogatory answers, and affidavits — only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. FED. R. CIV. P. 56(c); Beyene v. Coleman Sec. Servs., Inc., 854 F.2d 1179, 1181 (9th Cir. 1988).

In deciding whether to grant summary judgment, a court must take three necessary steps: (1) it must determine whether a fact is material; (2) it must determine whether there exists a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) it must consider that evidence in light of the appropriate standard of proof. Anderson, 477 U.S. at 248. Summary judgment is not proper if material factual issues exist for trial. B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir. 1999). "As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Disputes over irrelevant or unnecessary facts should not be considered. Id. Where there is a complete failure of proof on an essential element of the nonmoving party's case, all other facts become immaterial, and the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 323. Summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole. Id.

4

### III. Discussion

Both parties seek summary judgment on the issue of whether Warren's termination was in violation of the FMLA. It is undisputed that Warren generally qualified for and was entitled to the protections and rights provided by the FMLA. Moreover, Warren's "taking of FMLA-protected leave constituted a negative factor in the decision to terminate her." Bacheldor v. Am. W. Airlines, 259 F.3d 1112, 1125 (9th Cir. 2001). Indeed, Snap-On has cited no reason for Warren's termination other than Warren's taking of leave pursuant to the FMLA on November 7 and November 10, 2008, and her failure to call in to report the rescheduling of her surgery that made her unexpectedly available for work on those dates. (See D.'s Br. in Support of D.'s MSJ at 2 (#17) (stating that Warren "was terminated on November 13 for failing to either show up for work or call in on November 7 and 10").) Thus, for Warren to prevail on her claim, she need only demonstrate that "she is entitled to the benefit she claims," that is, that she was entitled to take FMLA leave on November 7 and November 10, 2008. Bacheldor, 259 F.3d at 1126.

Snap-On analogizes the circumstances of this case to cases where an employee fraudulently misuses FMLA leave. We do not agree that the analogy is apt. For example, in Parker v. Verizon Pennsylvania, Inc., 309 F. App'x 551 (3d Cir. 2009), an employee misrepresented his health condition to his employer by taking a "sick day" to work on building his new house. Id. at 563. Similarly, in Tellis v. Alaska Airlines, Inc., 414 F.3d 1045 (9th Cir. 2005), an employee claimed to be taking leave for the purpose

5

of caring for a family member, but instead used the time to travel across the country to retrieve a family vehicle. Id. at 1046. Here, by contrast, there is no evidence of any fraudulent intent on the part of Warren. She properly sought and was approved for FMLA leave to seek care for an actual medical condition; her surgery was twice rescheduled on the doctor's initiative, not her own. The question here is not one of fraud, but whether Warren was required under the FMLA to inform Snap-On that she was unexpectedly available to work on November 7 and November 10, 2008, and to offer to work on those days, though she was not scheduled to do so because of her requested and approved FMLA leave.

Snap-On also argues that the regulations implementing the FMLA place on the employee the duty of notifying her employer "as soon as practicable if dates of scheduled leave change or are extended, or were initially unknown." 29 C.F.R. § 825.302(a). This argument fails because the quoted regulatory language is taken out of context. Under this section of the regulations, it is the duty of the employee to give the employer advance notice, when practicable, of a foreseeable need for the employee to take an FMLA leave. Id. Here, Warren gave Snap-On advance notice of her foreseeable need for FMLA leave, and was approved on the basis of her scheduled surgery date. It was not until the evening of November 6, 2008, after her last scheduled shift prior to her approved FMLA leave, that Warren's doctor called to reschedule the surgery. Section 825.302(a) does not speak to the duties of an employee who

6

discovers on the eve of an approved and scheduled FMLA leave that her circumstances have changed.[1]

The regulations implementing the FMLA in effect at the time of Warren's termination contemplate that "an employee may discover after beginning leave that the circumstances have changed and the amount of leave originally anticipated is no longer necessary." 29 C.F.R. § 825.309(c). An employer may require that the employee provide notice of such changed circumstances, either through required periodic status reports or otherwise. Id. § 825.309(a) and (c). To enforce such a requirement, however, the employer must provide the employee with specific written notice. Id. § 825.301(b)(1) ("The employer shall . . . provide the employee with written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations").

Here, Snap-On provided Warren with a number of documents detailing the specific expectations and obligations of Warren with respect to her FMLA leave. Nowhere in those documents, however, is any specific requirement that Warren inform Snap-On of unexpected changes in circumstances such as the last minute rescheduling of her surgery. On the contrary, Warren was explicitly not required to make periodic reports regarding her status and intent to return to work, and Snap-On explicitly disclaimed any requirement that

---

[1] The parties spill much ink on the issue of whether Warren was already on FMLA leave or not on the evening of November 6, 2008, when she was informed that her surgery was rescheduled. This issue, however, is really beside the point. The problem of whether Warren was provided with adequate notice of the specific expectations and obligations of her, discussed below, applies equally in either case.

7

Warren notify it if the circumstances of her leave changed. (Employer Response to Employee Request for Family or Medical Leave, P.'s MSJ, Ex. C, ¶ 8 (#21-1).)

It must be noted that the language of this section of the documentation provided to Warren is aimed more at changes in circumstances that would hasten the end of an approved leave, rather than changes that would delay the start of such a leave: "If the circumstances of your leave change and you are able to return to work earlier than the date indicated on the reverse of this form, you . . . will not be required to notify us at least two work days prior to the date you intend to report to work." (Id.) Nevertheless, this is the only section of the FMLA notices provided to Warren that she could have plausibly looked to for instruction regarding her circumstance. To the extent that Warren could have discerned from the documentation any guidance with regard to her obligations under the circumstances, that guidance was that she need not call in or report to work. At best, therefore, Snap-On failed to provide Warren with "written notice detailing the specific expectations and obligations" of her; at worst, the written notice Warren received actively misled her.

The applicable regulations also provide that Snap-On could require Warren "to comply with the employer's usual and customary notice and procedural requirements for requesting leave." 29 C.F.R. § 825.302(d); see also id. § 825.301(a). On this basis, Snap-On asserts a right to enforce its usual and customary policy regarding "no call/no show absences." Under this policy, employees are required to "call in their absence prior to the start of the

8

shift." (Attendance Policy, P.'s MSJ, Ex. J at 2 (#21-1).  If the employee fails to do so once, the employee receives a written warning; a second offense results in termination.  (Id.)

There is nothing in the attendance policy, however, nor in any of the other guidance regarding company policies in evidence, that explicitly applies Snap-On's policy relating to "no call/no show absences" to situations such as Warren's.  Indeed, the attendance policy states that it is intended to encourage "[r]egular attendance during <u>scheduled</u> work hours" as a "basic expectation of employment."  (Id. at 1 (emphasis added).)  Because of her requested and approved FMLA leave, Warren was not scheduled to work on either November 7 or November 10.  Nor is there any specific indication in the documents describing Snap-On's policy relating to "no call/no show absences" that the policy might be applied to circumstances where an employee is physically capable of working, but was not scheduled to work.

Snap-On company policy also provides for the termination of any employee who "engages in any type of gainful employment while on family and medical leave, or who fraudulently obtains family and medical leave."  (Leave of Absence Policy, P.'s MSJ, Ex. K at 39 (#21-1).)  There is no allegation that Warren engaged in any "gainful employment" while on leave; it is undisputed that she spent November 7 and November 10, 2008 at home, cleaning her house or just "doing nothing."  As discussed above, Warren did not engage in fraud in obtaining her leave.  It turned out, through no fault of Warren, that her requested leave was scheduled less than ideally.  This does not, however, amount to fraud on the part of

9

Warren, but only an unexpected circumstance. Warren did not, it turns out, handle that unexpected circumstance as Snap-On would have wished her to do. There is nothing in the record, however, showing that Warren was provided with specific written notice of Snap-On's expectations of her in such circumstances. C.f. Lewis v. Holsum of Fort Wayne, Inc., 278 F.3d 706, 710 (7th Cir. 2002) (employer entitled to enforce requirement, described in detail in attendance policy, that employee call in each day under certain circumstances).

In sum, nothing in the notices given to Warren when she was approved for leave, nor in policies generally applicable to Snap-On employees, put Warren on notice that she was required to inform Snap-On of the last-minute rescheduling of her operation, or to come in to work, though she was not scheduled to do so because of her approved leave. As such, Warren's absences from work pursuant to her approved FMLA leave on November 7 and November 10, 2008, qualified for protection under the FMLA, even though her surgery did not take place until November 11, 2008. Thus, Snap-On's termination of Warren violated the FMLA.

### IV. Conclusion

Warren properly sought and was approved for FMLA leave to seek medical treatment, namely, surgery on her wrist. Through no fault of her own, she did not receive the surgery on the expected date. As such, she was physically capable of working on the two business days prior to her surgery, the first two days of her scheduled FMLA leave. Warren did not report this unexpected

10

circumstance to her employer, nor did she report to work on those dates.  Snap-On, however, failed to provide Warren specific written notice that it expected her to call in or report to work in such a circumstance.  As such, Snap-On is liable for violating Warren's rights under the FMLA by terminating her employment on that basis.

Neither party has addressed the issue of damages in their respective motions for summary judgment.  The case, therefore, will proceed with respect to the issue of damages only.

**IT IS, THEREFORE, HEREBY ORDERED** that Snap-On's motion for summary judgment (#16) is **DENIED**.

**IT IS FURTHER ORDERED** that Warren's motion for summary judgment (#21) is **GRANTED**.

DATED: July 21, 2010.

_____
UNITED STATES DISTRICT JUDGE

11